CLERK, U. S. DISTRICT COURT IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
FILED
12/6/95 FOR THE SOUTHERN DISTRICT OF TEXAS
MICHAEL N. MILBY, CLERK
BY DEPUTY

HOUSTON DIVISION

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
ENTERED

DEC 8 1995

Michael N. Milby, Clerk

|  |  |  |
|---|---|---|
| COMPAQ COMPUTER CORPORATION | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 95-1338 |
| | § | |
| | § | |
| PROCOM TECHNOLOGY, INC. | § | |
| Defendant. | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

In May, 1995, Compaq Computer Corporation ("Compaq") filed suit against Procom Technology, Inc. ("Procom"). Compaq's suit alleges that Procom has infringed its trademark, trade dress, copyright and patent rights, engaged in unfair competition, and in false advertising. Procom asserts several affirmative defenses to Compaq's claims and also maintains that Compaq's claims are barred by unclean hands and that Compaq has engaged in unfair competition. Procom also seeks declaratory judgment that Compaq's patents are invalid.

The case was tried to the Court on August 21, 1995 through August 23, 1995 on all except the patent claims.[1] After reviewing the evidence, the submissions of the parties, and the applicable law, the Court enters the following findings of fact and conclusions of law.

---

[1] These claims were bifurcated and are scheduled for trial next year.

## FACTUAL FINDINGS

A.     The Parties

Compaq is a large computer company whose product line includes both hardware and software. Compaq advertises and sells all its products under its COMPAQ trademark. The name Compaq is well known throughout the United States and the world.   The COMPAQ trademark is registered with the United States Patent and Trademark Office under registration number 1,467,066.

Procom is also a computer company whose relevant business is the sale and distribution of hard drives and hard drive trays for use with specific Compaq products.

B.     Compaq Servers & Hard Drives

One of Compaq's products is the ProLiant line of network servers.[2]  The ProLiant server, like other servers, requires the use of hard disk drives[3] for data storage purposes. One of the attractive features of the ProLiant server is that the hard drives may be added or removed while the server is in operation.  This feature is called "hot-pluggability."

Compaq markets hot-pluggable hard drives specifically for use with its ProLiant servers.  At issue in this lawsuit are three models of hot-pluggable drives:  the 2 gigabyte

---

[2]  A server acts as a common data source for a network of client computers.  A network may consist of multiple client computers and multiple servers linked together.  The network may operate in different buildings and in different states.  The person responsible for the operation of a network is called the network administrator.

[3]  A hard drive consists of a rotating disk of magnetic media on which data can be recorded and from which data can be retrieved.  The hard drive communicates with the server through a hardware component called the drive "controller."  Each ProLiant server in a network can operate a number of hard drives.

2

CMPDF - www.fastio.com

("GB") drives which come in a "high-profile" and a "low-profile model," and the 4 GB drive which has only one profile. All three of these drives are manufactured for Compaq by a third party, Seagate Technology, Inc. ("Seagate"). In addition to the Compaq drives, ProLiant servers are also compatible with hard drives sold by third parties.

C.    Hard Drive Trays

Hard drives used with the ProLiant server are mounted on a tray specially designed to enable hot-pluggability. The tray consists of a plastic base containing a circuit board that plugs into the server to make the necessary connections.

Compaq sells trays designed for this purpose. Compaq trays may be used with both Compaq drives and third party drives. Compaq sells these trays separately as well as premounted with hard drives.

Compaq trays feature a light gray and medium gray color scheme. The trays have lights and icons which indicate the light's function. The placement of the lights is in part dictated by the design of the server. The server houses the drives in individual bays, covered by a protective hinged panel. The panel contains slots through which the indicator lights may be viewed.

Compaq trays comply with Underwriters Laboratories' safety requirements for electronic devices. The bottom of the tray contains no large openings through which a user might inadvertently touch the drive when removing the drive and tray from the server. This is important because the drives operate at high temperatures and can become quite hot.

During the development of the drives, Compaq discovered that there is a risk of data loss to surrounding drives when another hot-pluggable drive was inserted into the server. The cause of this potential problem is electrostatic discharge ("ESD"). To solve this problem, Compaq developed a special metal shield to dissipate the effects of ESD and protect data. A different shield was developed for each drive model.

D.  Compaq Insight Manager

Customers purchasing a ProLiant server have the option of purchasing two additional items, the SMART controller and Compaq's Insight Manager program ("CIM"). CIM was developed by Compaq in order to allow the network administrator to monitor the performance of the hard drives running in the server. CIM works in conjunction with the SMART Controller to track numerous elements in the ProLiant server and provide the network administrator warnings of potential problems. Based on this information, the network administrator can dispatch service technicians, call for warranty service, or take other action to remedy the problem.

Some of the components monitored by CIM are the hard drives used by the server. CIM reports certain data for all drives; however, the amount of data reported depends on the type of drive being used and whether the customer has received upgrade software from Compaq. For example, for all drives, including third party drives, CIM will report whether the drive is working, drive capacity, service hours, and firmware version. In addition, Compaq will provide a software upgrade to customers using third party drives which enable CIM to report supplementary information regarding the drive's operating

4

history.  Finally, customers who use Compaq drives receive the full range of data the CIM is capable of reporting, including a feature known as prefailure warnings.

E.     Prefailure Warnings & Threshold Values

One of the more desirable attributes of CIM is its ability to generate "prefailure warnings."  A prefailure warning is an indication to the network administrator that a drive has reached a point in its life where failure may be imminent.  This allows the administrator to replace the drive prior to failure and avoid the risk of having the drive fail while in operation.

The prefailure warning program was developed as part of a warranty package provided by Compaq to those customers who buy Compaq drives.  When a hard drive has degraded below a predetermined "threshold value," a prefailure warning is triggered. Once this happens, Compaq will replace the drive that triggered the warning even though it has not actually failed.  Although the prefailure warning system was developed as part of a warranty program, CIM will continue to issue the warning even if the drive is no longer under warranty.

In designing the prefailure warning component of CIM, Compaq made several choices.  Compaq had to determine both the number and the particular parameters which it would monitor through CIM.  In addition, Compaq had to decide upon the appropriate threshold value for each of the five parameters selected.[4]  In selecting the threshold value,

_____

[4] The threshold values are different for each of the three models of hard drives.

5

Compaq had to consider the point at which the drive would actually fail and then select a threshold that would be reached before actual failure. However, Compaq did not want to set the prefailure point too early in the life of the drive, otherwise Compaq would incur unnecessary expenses. Thus, the point at which the warning is triggered is based on both engineering and business related judgments.

The threshold values are contained in a portion of the hard drive known as the Monitor and Performance Partition ("M&P Partition"). The M&P Partition contains data[5] in addition to the threshold values, however, only the latter are necessary for Compaq's prefailure warning program. Compaq registered the threshold values for each of its three drives with the United States Copyright Office under registration numbers TX-3-926-599, TX-3-924-600, and TX-3-924-601. The threshold values are but a small percentage of the total amount of information registered by Compaq. The registrations were issued under the "Rule of Doubt." The Rule of Doubt is used by the Copyright Office for registrations submitted in formats that are not understandable to humans.

Compaq provides warranty service for Compaq hard drives only. Thus, the prefailure component of CIM was designed solely to work with Compaq drives. All Compaq drives are intended to be sold complete with a copy of the threshold values. In contrast, third party drives do not contain the same data in the M&P Partition. In

---

[5] The M&P Partition of Compaq drives contains various groups of data known individually as the "header," which is a Compaq copyright notice, the "signature," the "checksum," as well as the appropriate threshold values for the drive.

particular, third party drives do not contain the Compaq copyright notice and the threshold values. Without the threshold values, the prefailure warning system will not work.

In the event that Compaq drives are sold without the necessary threshold values, Compaq has designed a method by which the correct values are written onto the drive. In a portion of the drive known as the firmware, all hard drives contain a vendor identification string ("vendor ID"). The vendor ID allows computers to identify themselves electronically to each other. The placement of the vendor ID in the firmware is dictated by an industry standard called the Small Computer System Interface. Compaq drives contain the word Compaq in the vendor ID portion of the drive firmware.

When a new drive is added to a ProLiant server, the network administrator runs a Compaq program called EISA Config. EISA Config determines whether the drive is a Compaq drive by checking the vendor ID. If the drive is a Compaq drive, but does not contain the threshold values, EISA Config writes those values to the drive. Once the values are added, CIM will report prefailure warnings for the drive.

F.     Procom's Products

Procom distributes two products which are at issue in this lawsuit. The first product at issue is Procom's line of hard drives designed for use with the ProLiant server. Like Compaq, Procom purchases its drives from Seagate. Like Compaq, Procom offers a warranty program in which it agrees to replace its drives prior to failure. However, Procom did not develop its own prefailure notification system. Instead, after receiving

7

drives from Seagate, Procom modifies the drives so that they access all features of CIM, including the prefailure warnings.

Procom understood that its customers valued the features offered by CIM. Therefore, it set out to discover how it could modify its product to work in the same manner that Compaq drives work.  In the early stages of developing drives that were compatible with CIM, Procom learned that it could access all features of CIM by modifying the firmware of the drives.  When received from Seagate, the drives identified Seagate as the vendor in the vendor ID portion of the firmware.  However, Procom discovered that by changing the vendor ID to Compaq, the requisite threshold values would be written to the drive, as described above.  However, Procom decided not to market this drive because it was uncomfortable with the idea of shipping a product that incorrectly identified the vendor as Compaq.

Next, Procom determined that the M&P Partition contained data which enabled the prefailure warnings.  The data are the threshold values, described above.  Although Procom did not understand what the data represented, it was able to copy the necessary data to its drives and thereby enable the warnings.  Procom began selling these drives to ProLiant server owners.  However, a percentage of these drives contained incorrect copies of the threshold data.[6]  Procom corrected this mistake and continued selling these drives until it was sued by Compaq for copyright infringement.

_____

[6] Procom's error was in copying the data from Compaq's 2 GB model onto all three of Procom's models.

8

After being sued, Procom reverted to the method of manufacture in which it changed the vendor ID in the firmware to specify Compaq as the vendor. This way, Procom did not actually copy any of the necessary data. The copying was done when the customer installed the drive and ran the EISA Config program. However, this alteration of the vendor ID has an unavoidable and unintentional consequence. When the network administrator runs CIM, a portion of the screen display identifies the vendor of the drive as Compaq. Had the drive been properly labeled as a Procom or a Seagate drive, those identifiers would appear on the screen. This result is of particular significance because the specific hard drive may not be located where it is easily accessible. Consequently, greater reliance may be placed on the screen display than would otherwise be the case if the user could simply reach over and pull the hard drive out of the server.

The second Procom product at issue in this suit is the drive tray sold by Procom for use with its hard drives. Initially, when Procom began selling drives for use in the ProLiant, it purchased genuine Compaq trays for use with the drives. However, in March or April 1995, Procom switched from Compaq trays to trays manufactured by a third party, CI Designs. These trays were virtually identical to the Compaq trays. However, the Procom trays did not display the Compaq logo and instead featured the Procom logo "P" and the word "Procom" marked on the tray faceplate. In addition, the Procom trays lacked front panel slits which were part of the Compaq tray.

In August, 1995, Procom began selling a new design of the tray that differs significantly from the tray it replaced. Differences include redesigned locking

9

mechanisms and the use of words rather than icons above the indicator lights on the trays. Procom no longer sells the trays complained of by Compaq.

G.     Compaq's Service Advisories

After becoming aware of Procom's sale of hard drives for use with ProLiant servers, Compaq notified its customer service personnel and resellers about potential problems that Compaq perceived with third party drives.

Compaq prepared a product problem report ("PPR 1203") which identified several potential problems with Procom drives.  PPR 1203 discussed three issues:  the risk of improper contact with drives because of large openings on the bottom of the tray, the inaccurate copy of the threshold values, and the risk of data loss from electrostatic discharge.  PPR 1203 states "Compaq Confidential - Compaq only."  Although PPRs are prepared for Compaq internal use only, PPR 1203 was distributed to at least one non-Compaq employee.

Compaq also issued a document entitled Service Advisory 877 which describes risks in using third party drives.  Service Advisory 877 does not mention Procom by name but does address third party drives "advertised as 100% Compaq compatible."  The advisory warns that third party drives may be at risk for data loss, false prefailure notification, and safety hazards.

Any finding of fact that should be construed as a conclusion of law is adopted as such.

10

## LEGAL CONCLUSIONS

### I.  Procom's First Drives

Compaq contends that Procom's first line[7] of hard drives contained an unauthorized copy of Compaq's copyrighted threshold values in violation of the Copyright Act, 17 U.S.C. § 101 et seq.  Procom counters that the threshold values are not protectable expression, or alternatively, that its use of those numbers is permissible according to the doctrines of merger, fair use, and the *scènes à faire* doctrine.  For Compaq to prevail on its claim, it must show that the threshold values, either individually or as a compilation, are copyrightable expression and that Procom copied the protected material.  McGaughey v. Twentieth Century Fox Television, 12 F.3d 62, 64 (5th Cir. 1994).

### A.  Copyrightability

Compaq registered the threshold values with the United States Copyright Office.  However, the registrations were issued under the Rule of Doubt.  This means that the Copyright Office was unable to verify that the data was copyrightable because it is not in a format that is understandable to humans.  Apple Computer, Inc. v. Franklin Computer Corp., 714 F.2d 1240, 1255 n.9 (3d Cir. 1983), cert. dism'd, 464 U.S. 1033 (1984).  The legal effect of such a registration is that it is not entitled to the usual presumption of validity.  Accordingly, the burden is on Compaq to establish that the threshold values, or the compilation of the threshold values, are copyrightable.

---

[7]  The first line of hard drives are those that contained a copy of the M&P partition originally found in Compaq's drives.  See section F, supra.

11

It is fundamental in copyright law that facts cannot be copyrighted.   Feist Publications v. Rural Tel. Serv., 499 U.S. 340, 345 (1991).   However, in certain situations, compilations of facts are protectable.   17 U.S.C. § 101; Feist, 499 U.S. at 345.   The key consideration in determining whether a compilation is copyrightable is the degree of originality embodied in the work.   If the compilation reflects choices by the author such as "which facts to include, in what order to place them, and how to arrange the collected data so that they may be used effectively by readers," then the work probably reflects sufficient originality to merit protection.   Id. at 348.

Compaq's compilation of the five threshold values meets the standard announced in Feist.   In deciding which parameters to monitor through CIM, Compaq had numerous choices.   Compaq exercised its discretion in choosing both the number of parameters to monitor - five, and which five particular parameters those would be.[8]   Presumably Compaq could have chosen to track a higher or lower number of parameters.   Compaq could also have chosen a different combination of parameters.   Accordingly, the choices made by Compaq reflect the requisite degree of creativity and judgment necessary to

_____

[8]   Procom argues Compaq's compilation cannot be copyrighted because although Compaq may have options in selecting the parameters to track, once those parameters are identified, competitors may not choose alternatives if they want their drives to be fully compatible with CIM.   This argument focuses incorrectly on the choices available to the copier rather than the author.   The issue is not whether the *copier* had any choice of data to use, but whether the *author* had any choice.   If the author had no choice in selecting the data, then clearly neither judgment nor creativity played a role in compiling the work.   The issue of whether the copier had any choice but to use the selected information is dealt with in the context of Procom's affirmative defenses.

12

protect its compilation.[9]

Not only does Compaq's compilation reflect originality, but perhaps more importantly, the underlying elements of the compilation are not facts. Unlike a telephone number,[10] or the date a bond is redeemed, the threshold value is not empirically verifiable. Instead, the particular threshold value is the result of a decision making process by Compaq based on at least two variables. First, Compaq must estimate when the drive will actually fail. This conclusion is factual in nature although ultimately it is more a prediction than a fact. In addition to making this prediction, Compaq must make a business decision as to the point in the life of the drive that Compaq is willing to replace it under its warranty program. In making this decision, Compaq must weigh several considerations such as the cost of replacing drives too early in their life versus the risk of waiting too long to replace and drive and having it fail while in use. It seems unlikely that other drive manufacturers, facing different economic considerations and different customer expectations, would choose the exact same point in time to replace a

---

[9] Procom's reliance on Financial Info. Inc. v. Moody's Investors Serv., 808 F.2d 204 (2d Cir. 1986) is misplaced. In that case, the Second Circuit held that a financial report which contained nothing more than five facts gleaned directly from newspaper notices did not embody any independent creation. Compaq's compilation is more analogous to the report at issue in Eckes v. Card Prices Update, 736 F.2d 859 (2d Cir. 1984). There, the same court found that a compilation listing 5,000 premium baseball cards out of a possible 18,000 cards was copyrightable because the compilers exercised both judgment and creativity in choosing the particular 5,000 most valuable cards.

[10] See Feist, 499 U.S. at 342.

[11] See Financial Info. Inc., 808 F.2d at 205.

drive that Compaq chose.

B.      Merger

The doctrine of merger denies copyright protection to a work if that work is the only way to express a particular idea.  Mason v. Montgomery Data, Inc., 967 F.2d 135, 138 (5th Cir. 1992).  In this situation, the expression is viewed as having merged with the idea itself. To allow copyright of the expression would result in a grant of a monopoly over the underlying idea.  "In the computer context, this means that when specific instructions, even though previously copyrighted, are the only and essential means of accomplishing a given task, their later use by another will not amount to infringement."  National Commission on New Technological Uses of Copyrighted Works, Final Report at 20 (1979).

The specific question presented here is whether the copying of the threshold data is permissible because those data are the only way to express the idea of predictive drive failure.  It has already been determined that to obtain prefailure warnings through CIM, the drive must have the five numbers representing the five parameters monitored by the program.  A third party attempting to gain access to CIM has no choice but to also select those five parameters for observation.[12]  If a third party selected other parameters, then any warnings that CIM issued would be meaningless.

---

[12] Moreover, the use of five numbers to access CIM is probably best characterized as a system.  Under § 102(b) of the Copyright Act, systems, methods, and procedures are not copyrightable - only their expression is, and only to the extent that there are several means of expression.

However, the third party is not limited to the selection of the five precise numbers chosen by Compaq as its "as-new values." As described above, these numbers do not simply represent the point at which the drive will fail.[13] They represent the point that *Compaq* deems most optimal to replace the drives. There are numerous ways that a drive supplier may express its opinion as to when it should replace its drives. Therefore, the Court finds that the doctrine of merger does not strip Compaq's threshold values of copyright protection.

C.    Fair Use

Assuming that the threshold values are copyrightable, Procom asserts that its use of the data is a "fair use" and does not constitute infringement. The factors to be considered in determining whether a particular use is a fair use include:

> (1) the purpose and character of the use, including whether such a use is of a commercial nature or is for nonprofit educational purposes;
> (2) the nature of the copyrighted work;
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107.

The first statutory factor requires the court to determine whether the copy was

---

[13] Merger would be implicated if Compaq's threshold values were solely predictions of when the hard drives would fail. In that situation, Compaq's selection of data would amount to "the first step in an analysis that yields a precise result or [] a better-than-average probability of some result . . . ." Kregos v. Associated Press, 937 F.2d 700, 707 (2d Cir. 1991).

made for commercial use or for some other purpose. Copying purely for commercial use mitigates against a finding of fair use. However, in evaluating this factor, the court should undertake a fact-specific analysis rather than "elevating commerciality to hard presumptive significance." Campbell v. Acuff-Rose Music, Inc. 114 S. Ct. 1164, 1174 (1994). In essence, the court should move beyond a simple inquiry of commercial versus noncommercial purpose and instead consider whether the challenged use promotes the purposes of copyright law.

In Sega Enters. Ltd. v. Accolade, Inc., 977 F.2d 1510 (9th Cir. 1993), the Ninth Circuit was confronted with a similar situation. Sega, the plaintiff, manufactured video game consoles and video game cartridges for use in the consoles. In order to limit access to its console, Sega developed certain interface specifications which a cartridge must satisfy to function with the console. Sega later developed an additional security mechanism by including on compatible cartridges an initialization code which had to be present on the cartridge for it to work. The code consisted of four bytes of data: the word SEGA. Without this data, the cartridge would not work. Id. at 1514-16.

Accolade sought to manufacture game cartridges compatible with Sega consoles but without the necessity of obtaining a license from Sega. To develop this capability, Accolade reverse-engineered the microcode contained in Sega's cartridges. In the process of studying Sega's games, Accolade made several copies of Sega's copyrighted code. Eventually, Accolade identified the requirements for interoperability and released its own games. Later, when Sega added the initialization code, Accolade modified its cartridges

16

CMPDF - www.fastio.com

to include the code.  Id.  Sega sued Accolade, alleging that Accolade's copies of Sega's code violated its copyrights and that Accolade's use of the initialization code infringed on Sega's trademark.

The Ninth Circuit held that Accolade's copying of the copyrighted microcode was a fair use of the code.  Id. at 1520-28.  In making this determination, the Court relied primarily on the first factor of the fair use inquiry, the purpose and character of the challenged use.  While noting that Accolade copied Sega's code in order to produce a competing product, the court focused on how Accolade used the code it copied.  Although Accolade made verbatim copies of the copyrighted material, it used the code for an intermediate, rather than a final purpose.  Accolade used the copy to gain an understanding of how Sega's lockout mechanism worked.  Once Accolade understood the process, it developed its own code.  As the court noted, "there is no evidence that Accolade sought to avoid performing its own creative work."  Id. at 1522.  The court concluded that Accolade's purpose in copying the code was "simply to study the functional requirements for Genesis compatibility so that it could modify existing games . . . ."  Id.  So while the ultimate use resulting from Accolade's copying was a commercial product competing with Sega, the specific use of the copy was merely for educational or informative purposes.  On this basis the court determined that the first statutory factor favored Accolade.

In contrast, Procom's use of Compaq's threshold values was not an intermediate use, intended to facilitate the study of functional aspects of CIM.  As in Sega, Procom

17

made a verbatim copy of the copyrighted material. However, Procom never used the copy to develop its own, noninfringing product. Instead Procom simply reproduced the copied data onto its own drives to achieve interoperability. In addition, Procom, unlike Accolade, avoided performing its own creative work by simply copying the material from Compaq. Under the logic of <u>Sega</u>, the court should focus on the particular use of the copied material. Accordingly, the first statutory factor weighs in favor of Compaq because the particular use was also the ultimate use and the ultimate use was clearly commercial.

The second factor, the nature of the copyrighted work, contemplates varied degrees of protection for copyrighted works. The Copyright Act is intended to provide protection to expression rather than ideas, facts, or functions. Accordingly, a work may be copied if it is functional or factual. In addition, even expressive elements of a work may be copied if those elements "must necessarily be used as incident to" expression of the functional or factual aspects of the work. <u>Id</u>. at 1524 (citing <u>Baker v. Selden</u>, 101 U.S. (11 Otto) 99, 102-104 (1879)).

The data that Procom copied are necessary for access to the prefailure warning feature of CIM. Without the data, the drive will function in the server, and will receive some, but not all, outputs from CIM. This aspect of CIM is similar, but not identical to the lockout program at issue in the <u>Sega</u> case. However, third parties do not need to use the same five numbers that Compaq uses in order to receive prefailure warnings. Of course, merely selecting five numbers at random would be useless for although CIM

18

CMPDF - www.fastio.com

would issue prefailure warnings, those warnings would have no meaning.[14]  The reason that the prefailure warnings are meaningful is because they embody Compaq's expression of the point in time at which it is willing to replace drives.  This expressive aspect of the threshold values is no more functional than is any computer microcode.  In summary, since the threshold values have both functional and expressive components, the Court determines that this factor does not weigh in favor of either party.

The third factor, the amount and substantiality of the copying, is generally considered the least important factor of the fair use analysis.  E.g. Sony Corp. v. Universal City Studios, 464 U.S. 417, 449-50 (1984).  In absolute terms, Procom copied a only small percentage of material out of the total amount copyrighted.  However, proper consideration of this factor does not turn on a mechanical measurement of the percentage of material copied.  The court should also appraise the substantiality of the copy.  Campbell, 114 S. Ct. at 1175-76; Harper & Row Publishers, Inc. v. Nation Enters., 471 U.S. 539, 564 (1985).  Procom copied the core, or the heart, of Compaq's copyrighted material.  The only section of the M&P partition which embodies any real expression is the threshold value segment and this is the portion that Procom cloned.  Accordingly, this factor favors Compaq.

The fourth factor requires the court to examine the effect of Procom's copying on the market for, or value of, Compaq's copyrighted work.  In Sega, the Ninth Circuit

---

[14] See Factual Findings, section C supra, for a discussion of what the threshold values represent.

distinguished between copies which are merely the same "type" as the copied work versus copies which usurp the market for the copyrighted work. Sega, 977 F.2d at 1523. The court went on to find that this factor weighed in favor of the copier because Accolade sought only to produce games that legitimately competed with Sega. Compatibility with Sega's console was no more than a necessary precondition to competition. Rather, "it is the characteristics of the game program as experienced by the user that determine the programs' commercial success." Id.

In contrast, once Procom successfully copies Compaq's threshold values, Procom's product is a virtual duplicate of Compaq's product. The result of Procom's copying is to have a direct and adverse on the market for Compaq's work. Accordingly, the Court finds that this factor weighs strongly in favor of Compaq.

In summary, analysis of Procom's use of Compaq's copyrighted work leads this Court to the conclusion that Procom's conduct is not a fair use. Procom made a verbatim copy of Compaq's threshold values and used them without alteration. Procom made no attempt to understand how the numbers facilitated interoperability, let alone to understand the meaning of each particular number. To permit such a use as a fair use would be counter to the purpose of the Copyright Act.

D.      *Scènes à Faire* Doctrine

The *scènes à faire* doctrine denies copyright protection to expressions that are "standard, stock, or common to a particular topic or that necessarily follow from a common theme or setting." Gates Rubber Co. v. Bando Chem. Indus., Ltd, 9 F.3d 823,

838 (10th Cir. 1993). Elements of a program that have been dictated by external factors are also denied protection under this doctrine. Id. In the context of computer programs, these external factors include such considerations as "hardware standards and mechanical specifications, software standards and compatibility requirements . . . ." Id. (citations omitted).

Procom argues that since CIM dictates the order in which the threshold values appear on the hard drive, the ordering of the values cannot be copyrighted. The court agrees. In order to obtain prefailure warnings from CIM, the drive must contain five numbers in correct place on the drive. However, the warnings must be meaningful before a drive is truly compatible with CIM. Since the warnings are based on the tracking of five specific parameters, a third party seeking compatibility with CIM has no choice but to use those five parameters as well. In addition, the numbers representing those parameters must be ordered on the drive in the specific manner that CIM expects. If even one parameter was different, or written on the drive out of order, the prefailure warnings returned from CIM would have no meaning. This method of organizing CIM is a compatibility requirement that cannot be protected by copyright law. Both the *scènes à faire* doctrine and § 102(b) of the Copyrights preclude protection of such methods of operation.

However, while the ordering of threshold data may not be protected, the specific values chosen by Compaq are. The data may be part of a system of interoperability, but the precise values are an expression of Compaq's. A third party who understands the

21

workings of CIM and hard drives could potentially develop its own threshold values. While duplication of Compaq's numbers will produce the same results as would a Compaq drive, this is not required for interoperability and thus, the numbers themselves are protectable.

## II.  Procom's Second Drives

Compaq also takes issue with Procom's second, and current, line of hard drives. Procom's second line of drives differs from its first line in that these drives do not contain a copy of the M&P Partition from Compaq drives.  However, the firmware of the drives has been modified to identify the vendor as Compaq rather than Procom or Seagate.  Compaq contends that Procom's use of the word "Compaq" in the vendor ID portion of the drive firmware constitutes trademark infringement, counterfeiting, unfair competition, and contributory copyright infringement.

A.     Trademark Infringement

Procom's use of the word "Compaq" in the vendor ID portion of a drive's firmware has two relevant consequences.  First, it triggers the copying of Compaq's threshold data onto the drive where previously there had been no useful data.  The second consequence is that a screen display in CIM identifies the drive as a Compaq product. As a result, Procom's use of the word Compaq in the vendor ID portion of its drives serves to incorrectly identify the vendor of the drives.  Compaq contends that this misidentification constitutes trademark infringement in violation of the Lanham Act, § 32(1)(a); 15 U.S.C. § 1114(1)(a).

22

To prevail on its claim of trademark infringement, Compaq must demonstrate that Compaq is the owner of a valid trademark and that Procom's use of Compaq's registered trademark is likely to cause confusion. 15 U.S.C. § 1114(1)(a). Accordingly, even if there is a likelihood of confusion as to the source or vendor of Procom drives, for there to be trademark infringement, the Court must also find that Procom is the party responsible for that confusion. <u>Sega</u>, 977 F.2d at 1529.

1.     Source of Confusion

In <u>Sega</u>, Sega's "lockout code" had the secondary consequence of prompting a screen display of the Sega trademark. Both Sega and Accolade agreed that Accolade's use of Sega's lockout code was likely to cause confusion in the buyers of Accolade games. However, the Ninth Circuit found that Sega, not Accolade, was responsible for the confusion. <u>Sega</u>, 977 F.2d at 1529. In blaming Sega for the mislabeling problem, the court relied on two considerations. First, there was clear evidence that Accolade sought only to achieve compatibility with Sega's console and had no desire to represent its games as Sega products. <u>Id</u>. Second, the evidence also supported the conclusion that Sega's decision to use its trademark in connection with its lockout program was deliberate and in bad faith in that Sega intended "to lay the groundwork for the trademark prosecution of software pirates . . . ." <u>Id</u>.

Like Accolade, Procom did not seek to confuse its customers as to the source of the drives purchased. Although the use of the Compaq trademark was the first method by which Procom enabled prefailure warnings, it decided against using this method

23

because it was uncomfortable with labeling its product with a competitor's name. Procom only turned to this method when it was sued for copyright infringement based on the direct copying of the threshold values. In addition, Procom labeled and packaged its products clearly to identify them as sourced from Procom. It is clear that Procom was not seeking to mislead its customers into believing they were buying Compaq hard drives.

Unlike Sega, there is no evidence that Compaq's decision to use the vendor ID portion of the drive to trigger copying of the threshold values was made with the desire to falsely label third parties products as Compaq's. The screen display which identifies Compaq as the vendor was not added to CIM in order to cause confusion or to establish a basis for a trademark infringement claim. Rather, the vendor screen display is informational - it apprises the user of who manufactured or sold the drive that is currently being used. However, Compaq did make the decision to use its trademark as the key to EISA Config. Compaq should have known the competitors would be discouraged from developing competitive products because of the risk of mislabeling. See id. Compaq's decision to use the vendor ID portion of the drive to enable prefailure warnings had the effect of mislabeling other drives and thus, potentially excluding competitors from the market. Ultimately, the key consideration in this determination is the effect this particular use of the trademark rather than Compaq's intent. Id. at 1530. The effect of this use of the trademark is to limit competition.

2.    Functionality

In addition to finding that Compaq is responsible for any potential confusion, the

24

Court also finds that in this context, Compaq's trademark is not protectable because its use is purely functional. Functional features of a product are not protected under the Lanham Act. Sega, 977 F.2d at 1531. This is true even when the functional feature is a trademark. Id. Compaq bears the burden of proving nonfunctionality. Id.

A feature is functional if "it is essential to the use or purpose of the article or if it affects the cost or quality of the article." Inwood Laboratories, Inc. v. Ives Laboratories, Inc., 456 U.S. 844, 850 n.10 (1982). There are numerous factors the court can consider in making this assessment including the availability of alternative designs and the cost of producing those designs. Sega, 977 F.2d at 1531. An alternative method of production must be more than merely theoretical or speculative, it must be commercially feasible. Id.

Part of the actual benefit that a drive purchaser wishes to buy is compatibility with CIM and its prefailure notification feature. The use of the word Compaq in the vendor ID position provides this compatibility. There is an alternative method to the use of the vendor ID and that is directly writing the threshold values to the drive. However, the Court has determined that this type of direct copying is a violation of Compaq's copyright of the threshold data. This type of alternative method cannot be considered commercially feasible since it violates copyright law. Compaq has not established that there is any other commercially feasible method of achieving the desired result.

It is true that CIM will return prefailure warnings so long as data appears in the appropriate segment of the M&P Partition. However, the warnings have no value unless

the underlying data is meaningful. While it is certainly conceivable that Procom could develop its own threshold data, there is no evidence in the record to show that this is commercially feasible. Accordingly, the use of Compaq's trademark has the functional aspect of locking out users from access to CIM.

B.     Other Trademark Claims

The Court has determined that Procom has not violated the Lanham Act and that Compaq is responsible for any confusion related to Procom's second line of drives. Accordingly, Procom is not liable for common law trademark infringement or unfair competition, nor has it violated of § 16.29 of the Texas Business and Commerce Code.

C.     Contributory Infringement

Compaq also asserts a contributory copyright infringement claim based on Procom's modification of the drive firmware. The firmware modified drives do not contain any data which infringes Compaq's copyrights. However, when the drives are first used in the ProLiant server, EISA Config identifies the drives as Compaq drives and copies Compaq's copyrighted threshold values onto the drive. Compaq contends that Procom's sale of these drives contributes to the infringement of Compaq's copyrights.

The Copyright Act does not expressly make a defendant liable for infringement committed by a third party. However, the Supreme Court has recognized a limited form of vicarious liability against those who sell a product used to make unauthorized copies of protected material. Sony Corp. v. Universal City Studios, 464 U.S. 417, 434-42 (1984). This type of liability, also known as contributory infringement, is limited to

26

situations where the seller had constructive knowledge that a customer, or other third party, was using its to infringe copyrights, and where that product is "capable of substantial noninfringing uses." Id. at 442.

In is not disputed that Procom was aware that purchasers of its drives would cause a copy to be made of Compaq's threshold values when the drive was first used. In fact, it is certain that a customer who purchases a Procom drive which identifies Compaq as the vendor will infringe on Compaq's copyrights. The infringement occurs automatically upon the initial installation of the drive.

Procom contends, however, that since its hard drives have substantial non-infringing uses, it cannot be held liable for contributory infringement. While it is true that Procom's drives can be used for data storage, a non-infringing use, this argument misses the mark. Compaq does not challenge the sale of the drive itself and it has no objection to the sale of drives which do not incorrectly identify Compaq as the vendor. What Compaq complains of is the use of the Compaq trademark in the vendor ID portion of the hard drive. The vendor ID portion of the drive is separable from the underlying drive that contains this information. Accordingly, the proper focus is whether there are substantial non-infringing uses of the vendor ID feature rather than the entire drive. See Vault Corp. v. Quaid Software Ltd., 847 F.2d 255, 263-64 (5th Cir. 1988).[15] Procom's

---

[15]     In Vault, Vault developed a computer program, PROLOK, which protected other programs from unauthorized copying. In response, Quaid developed a program which circumvented PROLOK, entitled Copywrite. Copywrite contained a feature, RAMKEY, which, when used by a third party purchaser, resulted in the duplication of the program

27

sole use for modifying the vendor ID portion to read Compaq is to cause the threshold values to be written to Procom drive. Since Procom has shown no substantial non-infringing use for the modification of its drives to identify Compaq as the vendor, the Court finds that Procom's actions constitute contributory infringement.

Procom argues that the copying of the threshold data onto the Procom drives is expressly authorized under § 117(1) of the Copyright Act. This provision permits an owner of a computer program to copy or adapt that program provided that "such a new copy or adaptation is created as an essential step in the utilization of the computer program in conjunction with a machine and that it is used in no other manner." 17 U.S.C. § 117(1). This section was enacted in recognition that "a computer program cannot be used unless it is first copied into a computer's memory." Vault Corp. v. Quaid Software Ltd., 847 F.2d 255, 261 (5th Cir. 1988).

This section is inapplicable to the facts of this case. Purchasers of Procom drives are not copying or adapting any program in order to utilize that program with a machine. The only copy being made is that of the copyrighted threshold data from EISA Config onto the Procom drives. Section 117(1) applies to copies or adaptations of programs. Neither EISA Config, nor any other computer program is being copied or adapted for

---

originally protected by PROLOK. The developer of PROLOK contended that Quaid was guilty of contributory infringement. Vault, 847 F.2d at 256-58.

  In deciding the contributory infringement claim, the Fifth Circuit held that the RAMKEY feature was separable from the whole of the Copywrite program. Accordingly, in determining whether there were substantial non-infringing uses, the court looked solely at whether permissible uses existed for RAMKEY, rather than Copywrite. Id. at 263-64.

28

use. What is occurring is that the Procom drive is being adapted for use with CIM through the use of EISA Config.

Nor does Compaq's licensing agreement protect Procom. Procom relies on the following language contained in the licensing agreement between Compaq and purchasers of ProLiant servers:

> Some of the Programs have been optimized to run on Compaq products. Therefore, some of the Programs may not run as effectively or may cause errors in data or operation when the programs are used on non-Compaq products.

This statement merely acknowledges that while the ProLiant server is compatible with third party products, not all of those products will run as effectively with the ProLiant as would Compaq products. This statement does not support the conclusion that Compaq intended to allow copying of the threshold values onto third party drives.

### III. Procom's Drive Trays

Compaq alleges that Procom's drive trays infringe upon Compaq's trade dress rights in violation of 35 U.S.C. § 1125(a). In order to succeed in this claim, Compaq must show that Procom's trade dress was likely to confuse potential consumers as to the "source, affiliation, or sponsorship" of the drive trays. Society of Fin. Examiners v. National Ass'n of Certified Fraud Examiners, Inc., 41 F.3d 223, 227 (5th Cir. 1995).[16]

---

[16] Compaq must also show that the trade dress qualifies for protection. Taco Cabana Intern., Inc. v. Two Pesos, Inc., 932 F.2d 1113, 1118 (5th Cir. 1991), aff'd, 112 S. Ct. 2753 (1992). Trade dress qualifies for protection if it is not functional and it is either inherently distinctive, or has acquired secondary meaning. Id. at 1118-20.

In determining the likelihood of confusion, the court should consider numerous factors including the type of dress, the similarity of design, the similarity of the products, the identity of the purchasers, type of advertising, the defendant's intent, and actual confusion. <u>Amstar Corp. v. Domino's Pizza, Inc.</u>, 615 F.2d 252, 259 (5th Cir. 1980). While considering this nonexhaustive list of factors, the court should not lose sight of the ultimate question - whether consumers are likely to be confused. <u>Society of Fin. Examiners</u>, 41 F.3d at 228 n.15.

Compaq failed to establish that there is a likelihood of confusion as to the source of Procom's drive trays. Some factors do weigh in Compaq's favor. For example, the trays are virtually identical in many respects. The color scheme, the placement of lights and icons, and the locking mechanisms of the trays are the same for both companies. In addition, the products are marketed to the same type of consumer - purchasers of Compaq ProLiant servers. However, this market consists of sophisticated buyers. ProLiant servers and the hard drives and trays compatible with that system are expensive purchases and unlikely to be made on impulse. Consequently, this factor weighs in favor of Procom.

In addition, despite the physical similarity of the trays, both trays clearly identify the vendors with prominent logos on the tray's faceplate. Finally and perhaps most importantly, there was no evidence of actual confusion as to Procom's trays. "Although evidence of actual confusion is not necessary to a finding of likelihood of confusion, it is nevertheless the best evidence of likelihood of confusion." <u>Amstar</u>, 615 F.2d at 263.

After weighing the evidence presented at trial, the Court concludes that there is no likelihood of confusion between Compaq's and Procom's trays.[17]

### IV. Procom's Advertisements

Compaq alleges that two sets of Procom advertisements, one depicting a Compaq drive tray, and another referencing the compatibility of Procom drives with CIM, constitute false advertising in violation of section 43(a) of the Lanham Act. Section 43(a)(2) provides for a cause of action for what is commonly called false advertising.[18] When challenging a competitor's advertising under this section, a plaintiff must show that either "1) the challenged advertisement is literally false, or 2) while the advertisement is

---

[17] See Engineering Dynamics, Inc. v. Structural Software, Inc., 26 F.3d 1335, 1350 (5th Cir. 1994) (upholding the district court's reliance on the sophistication of the consumers, the prominence of the labeling, and the lack of actual confusion to support a holding of no likelihood of confusion).

[18] Section 43(a) of the Lanham Act, as amended, codifies two major types of unfair competition: infringement on marks, names and trade dress, regardless of whether registered, and false advertising. The false advertising component of § 43(a) states:

> (a) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which-
>
> . . .
>
> (2) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

31

literally true it is nevertheless likely to mislead or confuse customers." Johnson & Johnson Merck v. Smithkline Beecham Corp., 862 F.2d 294, 297 (2d Cir. 1992); see also Castrol Inc. v. Pennzoil Co., 987 F.2d 939, 943 (3d Cir. 1993) (holding that in a false advertising claim, "a plaintiff must prove *either* literal falsity *or* consumer confusion, but not both.").

A.    Drive Tray Advertisements

The first set of advertisements that Compaq complains of involve hard drive trays. When these ads were first developed, they showed Procom hard drives mounted on trays displaying a Compaq logo. At the time the ad was prepared, it was neither false nor misleading. That is, Procom was able to deliver exactly what was depicted in the ad - Procom drives mounted on Compaq trays.[19]  However, some time after the ads were published, Procom began to use third party trays rather than Compaq trays. Shortly after this switch to third party trays, Procom modified its advertisement by overlaying a Procom logo on top of the Compaq logo. Despite this alteration, a thin straight line at the bottom of the Compaq logo remained visible on the face of the tray. The lag time between the tray switch and the ad modification was about forty days.

During the lag time between the switch to third party trays, and the alteration of the ads, the ads falsely represented that Procom was selling Compaq trays when it was

---

[19]    There was nothing impermissible in Procom's sale of its drives mounted on Compaq trays. As noted above, Compaq sold its trays separately and in combination with its drives. The trays that Procom resold were genuine Compaq trays purchased from a Compaq reseller.

not. This conduct violates the Lanham Act. <u>Bangor Punta Operations v. Universal Marine Co.</u>, 543 F.2d 1107, 1108-09 (5th Cir. 1976). However, this conduct was short-lived and has long since been discontinued. As Compaq is seeking only injunctive relief, the Court considers the grant of an injunction unnecessary.

Procom's modified ads, displaying a Compaq tray with a Procom logo, are more problematic. In most situations, the use of a photograph of the plaintiff's product to advertise the defendant's product is a § 43(a) violation. <u>E.g.</u> <u>Truck Equipment Serv. Co. v. Freuhauf Corp.</u>, 536 F.2d 1210 (8th Cir. 1976), <u>cert. denied</u>, 429 U.S. 861 (1976); <u>Matsushita Elec. Corp. v. Solar Sound Sys., Inc.</u> 381 F. Supp. 64 (S.D.N.Y 1974). This type of conduct includes situations, like the one presented here, where the defendant removes the plaintiff's logo and substitutes their own.

However, despite Procom's use of an altered Compaq tray in its ads, the Court does not believe that Procom violated section 43(a). It is true that the tray depicted in the challenged ads was a Compaq tray. However, the drive trays that Procom was selling at that time were virtually identical to the Compaq trays. So similar in fact, that Compaq asserted a trade dress infringement claim relative to Procom's trays. The differences between the trays are not easily observable when looking at the actual trays, and even less so when looking at a black and white photograph of them.[20] Given that the differences

---

[20] In addition, these ads were transmitted to prospective customers via facsimile which makes distinguishing the tray advertised by Procom, and the tray the Procom delivered even more difficult.

between the displayed product and the actual product are slight, there is little chance that a customer could be mislead by the photograph in Procom's ads.  In the absence of any chance that customers will be deceived or mislead by the false depiction, the ad does not violate the Lanham Act.  See Merchant & Evans Inc. v. Roosevelt Building Products Co., 963 F.2d 628, 636; Vibrant Sales, Inc. v. New Body Boutique, Inc., 652 F.2d 299, 304 (2d Cir. 1981), cert. denied, 455 U.S. 909 (1982).

B.    Compatibility Advertisements

The second group of Procom ads that Compaq takes issue with contain statements that Procom drives are "100% compatible" and "fully compatible" with CIM and the ProLiant server.[21]  Compaq asserts that both of these claims are false in violation of § 43 of the Lanham Act.  Compaq bears the burden of proving that Procom's claims of compatibility are false or misleading.  Procter & Gamble Co. v. Chesebrough-Ponds, Inc., 747 F.2d 114, 119 (2d Cir. 1984).  In the absence of an industry standard stating otherwise, the word "compatatibility" has been defined as meaning "works with" or "functions with" another device.  Princeton Graphics Operating, L.P. v. NEC Home Electronics (U.S.A.), Inc., 732 F. Supp. 1258, 1261, 1262 n.9 (S.D.N.Y. 1990).  This definition applies equally to the terms "100% compatible" and "fully compatible" as well merely "compatible," as no other meaning for the former terms has been demonstrated.

Compaq relies on the following evidence in support of its false advertising

---

[21] Procom has now changed its advertisements to state that its drives are "compatible" rather than "fully compatible" or "100% compatible."

34

allegation. First, Procom's first drives contained prefailure threshold values that differed from Compaq's. Second, Procom's first drives did not have a cover to shield the drive from electrostatic discharge. Finally, Procom's first trays had large openings in the bottom that allowed the user to touch the exposed components of the drive. Without disputing this evidence, the Court nonetheless determines that it does not support a finding that Procom's ads were in violation of the Lanham Act.

Compaq does not deny that CIM will return the full range of outputs when run on a Procom drive. Rather, Compaq contends that that Procom's claims of compatibility are false and misleading because the prefailure warnings occur at the wrong time. That is, Procom drives will trigger prefailure warnings at a different point in time than do Compaq drives. However, Compaq has not established there is a wrong time for the drive to be replaced. Clearly, a wrong time for prefailure replacement would be after the drives have actually failed. However, Compaq merely speculated that this could happen with the threshold values contained on Procom's drives. There is no evidence that this could in fact happen. Short of actual drive failure, it is not clear that there is a "right time" for prefailure warnings to issue. Since CIM returns the same range of outputs on Procom drives that it does with Compaq drives, Procom drives "work with" and "function with" CIM. Accordingly, the Court finds that Procom's ads are not literally false.

In addition, the Court find that Compaq has not established the misleading nature of Procom's claims. The appropriate reference point for this determination is the

message conveyed by the challenged statements to the target audience.  <u>Johnson &</u>

<u>Johnson Merck</u>, 960 F.2d at 297-98; <u>Coca-Cola Co. v. Tropicana Prod. Inc.</u>, 690 F.2d

312, 317 (2d Cir. 1982).  Compaq did not present any evidence of how consumers

interpret Procom's claims of 100% compatibility.  It is conceivable that consumers view

this message as a representation that Procom drives will trigger prefailure warnings at the

same time that Compaq drives do.  However, this is not the only possible interpretation

of the statements, "100% compatible" and "fully compatible."  Moreover, it is not for

the Court to substitute its own opinion as to the meaning of these statements.  <u>Johnson</u>

<u>& Johnson Merck</u>, 960 F.2d at 297.  In the absence of proof as to how the relevant

market segment construed these representations, the Court cannot find that they were

misleading.

Similarly, with respect to the differences between Compaq trays and Procom trays,

Compaq has not shown that these differences make the representations of full

compatibility false or misleading.  The trays work with the ProLiant server in that drives

mounted on these trays are hot-pluggable.  Compaq has made no showing that 100%

compatibility requires that Procom trays have an electrostatic discharge shield or smaller

openings on the bottom of the tray.  Aspects of Compaq's product which make it more

desirable, and which are not featured in Procom's product are not necessarily required

for a showing that Procom's product fully functions with the server.  <u>B.H. Bunn Co. v.</u>

<u>AAA Replacement Parts Co.</u>, 451 F.2d 1254, 1269 (5th Cir. 1971).  Therefore, the

Court determines that Compaq has not made the requisite showing of falsity or misleading

character necessary to sustain a claim under § 43(a).

V. Procom's Unclean Hands Defense and Counterclaim

A.    Unclean Hands

Procom contends that Compaq is not entitled to an injunction because its Service Advisory 877 and PPR 1203 constitute unclean hands.[22] The doctrine of unclean hands permits a court to deny equitable relief to a party guilty of fraud, deceit, unconscionability, or bad faith relative to an issue present in the pending lawsuit. Performance Unlimited, Inc. v. Questar Publishers, Inc., 52 F.3d 1373, 1383 (6th Cir. 1995). Application of the doctrine is discretionary and does not apply when the party's behavior is not sufficiently serious. Id.; Los Angeles New Serv. v. Tullo, 973 F.2d 791, 799 (9th Cir. 1991).

The statements contained in PPR 1203 and Service Advisory 877 do not rise to the level of fraud in that Compaq had a factual basis for believing that unshielded drives were potentially subject to data loss, that certain third party drives contained inaccurate copies of Compaq's threshold values, and that third party drive trays did not sufficiently protect the user from contact with the drive itself. Research performed by Compaq and Seagate indicate that ESD is a risk to drive integrity. Even though that risk may be small, and even though Procom's drives comply with the appropriate standards, Compaq nonetheless had a reasonable basis for asserting that some drives unprotected by ESD shields may be

---

[22] See Factual Findings, section G supra.

37

at risk.   In addition, Procom's drives at one time did contain an inaccurate copy of Compaq's threshold values and Procom trays did contain openings on the bottom large enough that a person holding the tray could come into contact with the drive.   Therefore, the Court concludes that unclean hands does not apply and Compaq is not barred from seeking an injunction.

B.      Unfair Competition Counterclaim

Procom also contends that the statements contained in Compaq's service advisories amount to common law unfair competition, violation of § 43(a) of the Lanham Act, and violation of Tex. Bus. & Com. Code § 16.29.   Procom bears the burden of proving that Compaq's statements are false or misleading.   Procter & Gamble Co., 747 F.2d at 119. For the same reasons that the Court found unclean hands to be inapplicable, the Court determines that Procom is not entitled to recover on its counterclaim.

## VI.   Attorneys' Fees

Both Compaq and Procom seek attorneys fees to the extent that each is a prevailing party.   Under the Copyright Act, the court has discretion to award attorneys' fees and costs to a prevailing party.   17 U.S.C. § 505.[23]   In addition, under the Lanham Act, a prevailing party in a trademark case may be entitled to attorneys' fees, provided that the case is "exceptional."   15 U.S.C. § 1117.

---

[23] Section 505 provides:   "In any civil action under this title, the court in its discretion may allow the recovery of full costs by or against any party other than the United States or an officer thereof.   Except as otherwise provided by this title, the court may also award a reasonable attorney's fee to the prevailing party as part of the costs."

38

Until recently, the standard governing an award of attorneys' fees in a copyright case was very liberal. The Fifth Circuit stated that attorneys' fees are to be awarded to the prevailing party routinely under § 505. Micromanipulator Co. v. Bough, 779 F.2d 255, 259 (5th Cir. 1985). However, the Supreme Court has tempered this permissive standard in Fogerty v. Fantasy, Inc., 114 S. Ct. 1023 (1994). In Fogerty, the Court rejected the interpretation of § 505 that prevailing parties should be granted attorneys' fees as a matter of course. Id. at 1033. Instead the Court emphasized that under the clear language of the statute a fee award is discretionary. Id. In considering the issue, a district court should be guided by considerations such as "frivolousness, motivation, objective unreasonableness (both in the factual and in the legal components of the case) and the need . . . to advance considerations of compensation and deterrence." Id. at 1033 n.19 (quoting Lieb v. Topstone Indus., Inc., 788 F.2d 151, 156 (3d Cir. 1986)).

In light of these factors, the Court finds that an award of attorneys' fees is not warranted in this case. Procom's position was not objectively unreasonable. The relationship between copyright law and the computer industry is an ever evolving one and it was not unreasonable for Procom to believe that its actions may have been permissible. In addition, the Court finds that the objective of deterrence will be satisfied sufficiently with an injunction against the impermissible conduct. As Compaq did not prevail on its trade dress claims, it not entitled to attorneys' fees. Finally, Procom is not entitled to an award of attorneys under § 35 of the Lanham Act as the Court does not find this case to be exceptional.

CM/PDF - www.fastio.com

Any conclusion of law that should be construed as a finding of fact is adopted as such.

Based on the foregoing, the Court

ORDERS that Procom, its officers, agents, servants, employees and attorneys, and all persons in active concert or participation with any of them, be permanently enjoined from:

(a) reproducing, selling, distributing, or using unauthorized copies of Compaq's copyrighted data compilations, threshold values, or any portion thereof;

(b) manufacturing, advertising, offering for sale, selling, or distributing hard disk drives which cause the reproduction of unauthorized copies of Compaq's copyrighted data compilations, threshold values, or any portion thereof.

All other relief not specifically granted herein is DENIED.

SIGNED at Houston, Texas, on the __6__ day of December, 1995.


DAVID HITTNER
United States District Judge

40